IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FLEMING COMPANIES, INC., et al., | Case No. 03-10945 (MFW) |
| Debtors. | (Jointly Administered |

## NOTICE OF CROSS-APPEAL

Appellee/Cross-Appellant the Post Confirmation Trust (the "PCT), by and through and its undersigned counsel, hereby gives notice, pursuant to 28 U.S.C. § 158(a) and Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), of its cross-appeal to the United States District Court for the District of Delaware from the Memorandum Opinion (Docket No. 13198) and final order of the United States Bankruptcy Court for the District of Delaware granting, in part, DDB's motion for administrative claim, which order was entered on the docket in the above-captioned case on August 9, 2006 (the "Order") (Docket No. 13199). Copies of the Memorandum Opinion and Order are attached as Exhibits 1 and 2, respectively.

Pursuant to Bankruptcy Rule 8004, the PCT hereby requests that the Clerk of the Bankruptcy Court provide notice of this Cross-Appeal to counsel of record for the interested parties. The parties to the judgment appealed from and the names, addresses and telephone numbers of their respective counsel are as follows:

1

Appellant:            DDB Limited Partnership
Appellant's Counsel:  John C. Phillips, Jr.
                      Brian E. Farnan
                      Phillips, Goldman, & Spence, P.A.
                      1200 North Broom Street
                      Wilmington, DE  19806
                      (302) 655-4200

Appellee:             Post Confirmation Trust
Appellee's Counsel:   Laura Davis Jones
                      James K.T. Hunter
                      Scotta E. McFarland
                      Pachulski Stang Ziehl Young Jones & Weintraub LLP
                      919 North Market Street, 17th Floor
                      Wilmington, DE  19801
                      (302) 652-4100


Dated:    August 23 , 2006          PACHULSKI STANG ZIEHL YOUNG JONES
                                    & WEINTRAUB LLP

                                    _Scotta M Farland_
                                    Laura Davis Jones (DE Bar No. 2436)
                                    James K.T. Hunter (CA Bar No. 73369)
                                    Scotta E. McFarland (DE Bar No. 4184)
                                    919 North Market Street, 17th Floor
                                    P. O. Box 8705
                                    Wilmington, DE  19899-8705 (Courier No. 19801)
                                    Telephone: (302) 652-4100
                                    Facsimile:  (302) 652-4400

                                    Counsel for Post-Confirmation Trust

2

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| FLEMING COMPANIES, INC. et al., | ) Case No. 03-10945(MFW) |
| | ) |
| Debtors | ) Jointly Administered |

**MEMORANDUM OPINION[1]**

Before the Court is the Motion of DDB Limited Partnership ("DDB") for allowance and payment of an administrative expense and cure claim in the amount of $564,414 under sections 503(b)(1)(A) and 365(b).  The Motion is opposed by the Post Confirmation Trust (the "PCT").  For the reasons set forth below, the Court will grant the Motion in part and will allow an administrative claim in the amount of $212,553.49.


I.    BACKGROUND

Fleming Companies, Inc. ("the Debtor") was a nationwide wholesale supplier of food and grocery products, as well as an operator of grocery stores.  In particular, the Debtor operated a grocery store located at 2806 Schofield Avenue, Schofield, Wisconsin (the "Premises") under a lease agreement with DDB (the "Lease") from 1994 through June 2003.  (Ex. PCT-1.)

On April 1, 2003, the Debtor and several of its affiliates filed voluntary petitions for relief under chapter 11 of the

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rule of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014.

Bankruptcy Code.  On May 12, 2003, the Debtor filed a motion for authority to sell certain grocery store assets and to assume and assign certain leases, including the Lease (the "Sale Motion"). In the Sale Motion, the Debtor asserted that no cure amount was due to DDB pursuant to section 365(b)(1)(A).  On May 28, 2003, DDB filed an objection to the Sale Motion, asserting a cure claim of \$550,000.  DDB supplemented that objection on May 30, 2003, asserting a corrected cure claim of \$750,000.  By Order dated June 4, 2003, the Court granted the Sale Motion and required that the Debtor place at least \$550,000 into an interest-bearing escrow account for the DDB cure claim until the amount due could be determined.

DDB filed its cure claim on October 2, 2003, and a Motion to compel allowance and payment of the cure claim on October 6, 2003.  On September 15, 2005, the PCT filed an objection to DDB's administrative claim.  An evidentiary hearing was held on the matter on January 13, 2006.  The parties have filed post-trial briefs, and the matter is ripe for decision.

II.  JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (M), (N) & (O).

2

III. DISCUSSION

In its Motion, DDB asserts it is entitled to a cure claim in

the amount of $564,414 pursuant to sections 503(b)(1)(A) and

365(b). Section 503(b)(1)(A) provides that:

> [T]here shall be allowed administrative expenses . . .
> including -
>     (1)(A) the actual, necessary costs and
>     expenses of preserving the estate . . . .

11 U.S.C. § 503(b)(1)(A). Section 365(b)(1) provides that:

> If there has been a default in an . . . unexpired
> lease of the debtor, the trustee may not assume such .
> . . lease unless, at the time of assumption of such . .
> . lease, the trustee -
>     (A) cures, or provides adequate assurance
>     that the trustee will promptly cure, such
>     default . . . .

11 U.S.C. § 365(b)(1).

The PCT does not contest DDB's entitlement to an

administrative claim for the amount necessary to cure the

defaults that existed at the time the Lease was assigned.

Rather, it contests the amount of that cure claim. In its

objection, the PCT asserts that many of the repairs actually

performed by DDB were to improve the Premises for the benefit of

the new tenant and not to cure any obligations the Debtor had to

maintain or repair the Premises. As a result, the PCT contends

that no more than $111,486 is due to DDB for its administrative

claim.

3

A.    Sale Order

In its Motion to compel, DDB initially asserts that it is
entitled to be paid at least $550,000 for its cure claim, because
that is the amount escrowed under the Sale Order.  The PCT
responds that the Sale Order did not allow DDB's cure claim in
that amount, but simply directed that the asserted amount be
escrowed until the cure claim could be allowed.

The Court agrees with the PCT on this point.  The terms of
the Sale Order are clear.  Exhibit A lists $0 as the undisputed
amount of DDB's cure claim that was required to be paid at
closing on the sale and lists $550,000 as the disputed amount of
the cure claim that was required to be escrowed.[2]

B.    Lease Terms

DDB also argues that the Lease required the Debtor to keep
the Premises in good repair, which it asserts that the Debtor
failed to do.  Specifically, the Lease provides that:

> Tenant, at its cost and expense, shall be
> responsible for all repairs and maintenance [other than
> structural repairs which are the responsibility of the
> Lessor], including but not limited to keeping all the
> interior and exterior of the Demised Premises in good
> repair, including but not limited to roof, downspouts,
> gutters, sidewalks, exposed and unexposed plumbing,
> doors and door closers, floor coverings, plastered
> surfaces (other than repair and maintenance due to
> structural problems or defects), plate glass, heating,
> ventilating and air conditioning systems, except for

---

[2]    The Sale Order also required that the escrow be increased
if, at the time of closing on the sale, the disputed cure claim
was more than listed on Exhibit A to the Sale Order.

4

> damage by fire and the elements and unavoidable
> casualty . . . .   Tenant, at its cost and expense,
> shall be responsible for striping, repairing and
> resurfacing the parking area and keeping it clean, in
> good repair and free of all debris; and shall keep the
> landscaping in good repair.

(Ex. PCT-1 at ¶ 9(b).)    The Lease further provides:

> If repairs are required to be made by Tenant pursuant
> to the terms hereof, Lessor may demand that Tenant make
> the same forthwith, and if Tenant refuses or neglects
> to commence such repairs and complete the same with
> reasonable dispatch after such demand, Lessor may make
> or cause such repairs to be made . . . .   If Lessor
> makes or causes such repairs to be made, Tenant agrees
> that it will forthwith, on demand, pay to Lessor the
> costs thereof.

(Id. at ¶ 9(e).)

Finally, the Lease details the tenant's obligations on

surrender of the premises:

> Tenant shall, upon termination of this Lease,
> whether by lapse of time or otherwise, surrender to
> Lessor the Demised Premises, together with all
> improvements, replacements and alterations thereto
> (except for Tenant's trade fixtures), broom clean and
> in such order, condition and repair as the Demised
> Premises were in on the date the Basic Term commenced,
> except for ordinary wear and tear and loss by casualty.

(Id. at ¶ 20.)

C.    Applicable Law

The PCT contends that Wisconsin law is controlling in this

case.   (Ex. PCT-1 at ¶ 25.)   The PCT argues that Wisconsin

decisional law provides that under terms similar to those in this

Lease, the tenant is obligated only to make such repairs as are

necessary to permit the premises to be used for a specific

purpose - in this case, a grocery store.  <u>See, e.g.,</u> <u>Lindsay</u>
<u>Bros., Inc. v. Milwaukee Cold Storage Co.</u>, 207 N.W. 2d 639 (Wis.
1973); <u>Finnegan v. McGavock</u>, 283 N.W. 321 (Wis. 1939).  DDB
argues that the cases cited by the PCT are distinguishable.

In <u>Finnegan</u>, the landlord sued for unpaid rent and the
tenant asserted he was entitled to an abatement of rent because
the building's elevator was inoperable.  283 N.W. at 323.  The
tenant relied on a provision of the lease that permitted rent
abatement if the premises were destroyed or rendered unfit for
occupancy or use.  <u>Id.</u>  The Court refused to abate the rent,
however, concluding that the lease provision related only to
"sudden catastrophic events such as fires, floods, or tornadoes,
and not to slow deterioration of the structure. . ." produced by
the elements.  <u>Id.</u>  That case, however, did not address the issue
of whether the tenant is obligated to make repairs required of
him under the Lease during the term of his occupancy.

In <u>Lindsay Bros.</u>, the Court addressed the obligation of the
tenant to return the premises to the landlord at the conclusion
of the lease.  207 N.W. 2d at 641.  In that case, the city
ordered the landlord to make repairs to an elevator after the
lease had expired and the tenant had vacated the premises.  <u>Id.</u>
The Court determined that under the lease, the tenant was
required to surrender the premises in the same condition as at
the commencement of the lease, reasonable wear and tear excepted.

6

Id. Consequently, the Court concluded that the lessee had "no responsibility for any repairs to the elevators in the absence of a finding that they were damaged by other than ordinary wear and tear." Id. at 645. It remanded the case to the trial court to make that determination. Id.

DDB argues that the Lindsay Bros. case is inapplicable because it did not address the lessee's obligation under the repair provision of the lease. It argues that Lindsay Bros. dealt with the lessee's obligation on termination of the lease and surrender of the premises. Id. In this case, DDB contends that the Lease has not been terminated and the issue is the effect of the tenant's duty to repair the Premises during the term of the Lease (paragraph 9) rather than the tenant's obligation on termination (paragraph 20).

The Lindsay Bros. Court did consider, however, the tenant's obligation to keep the premises in good repair during the term of the lease and stated that:

> The lessee's obligation for repairs [during the term of the lease] is simply to prevent him from claiming a breach of the lease by the landlord during the term for the failure to make repairs that were the lessee's obligation and not the lessor's. . . . A clause of this kind is properly construed to impose only a minimal duty on the tenant to undertake repairs. He is obliged to keep the premises in such condition that he can use them for the purposes for which they are leased, but he is not obligated to do more.

Id. at 643.

7

While this is dicta, it does provide insight into how the
Wisconsin Supreme Court would construe a repair provision such as
the one this Court is asked to interpret in this case.  See,
e.g., McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657 (3d
Cir. 1980) ("Considered dicta by the state's highest court may
also provide a federal court with reliable indicia of how the
state tribunal might rule on a particular question.")
Consequently, the Court concludes that the repair provision at
issue must be construed "to impose only a minimal duty on the
tenant to undertake repairs . . . [as are necessary] to keep the
premises in such condition that [the tenant] can use them for the
purposes for which they are leased."    Lindsay Bros., 207 N.W. 2d
at 643.

D.    Required Repairs

The PCT argues that under this standard, nothing is due to
DDB because the Debtor was in fact operating a grocery store at
the Premises at the time the Lease was assumed.    The PCT asserts
that this use proves that no repairs were necessary "to keep the
premises in such condition that [the tenant] can use them for the
purposes for which they are leased."  Id.

While the Court agrees with the PCT as to the legal standard
to apply, it reached a different result.  At the evidentiary
hearing, DDB presented several witnesses who testified about the
general condition of the Premises during the Debtor's occupancy

8

and at the time the Lease was assigned. (TR. 1/13/06 at 19, 21-22, 24-25, 27, 30-31, 54-59, 62-63, 70-72, 139-40; Ex. DDB-27.) There is no question that the Premises were in a deplorable condition at the time the Lease was assumed. In fact, the Debtor's former manager of the store testified at length that the Debtor refused to authorize him to make needed repairs and that he quit because he was embarrassed by the condition of the store. (Id. at 70-72.)  The PCT's own witness conceded that the Premises were in a terrible condition and that at least $132,000 in repairs were required to return them to "acceptable" condition for operation of a grocery store.  (TR. at 186-87.)

The PCT argues, however, that many of the repairs for which DDB seeks reimbursement were not required under the Lease, but instead were to renovate or remodel the Premises for the convenience of the new tenant.  The Court agrees that it must review each of the categories of repairs to determine what was necessary to allow the Premises to serve as a grocery store and, therefore, what repairs the Debtor is obligated to make under the Lease and Wisconsin law.

### 1.   Public Restrooms

There was credible and extensive testimony about the need for repairs to the public restrooms in the Premises.  The contractor for DDB testified that the public restrooms were not functioning and that the water had been shut off for a period of

9

time.  (TR. 1/13/06 at 19-21.)  He testified that the partitions were rusted and deteriorated, the toilets in the women's restroom did not work at all, and the porcelain in the men's restroom was cracked.  (Id.)  He testified that he charged $8,570 to repair the restrooms.  (Id. at 20; Ex. DDB-2.)  DDB seeks an additional $114 for the replacement of missing hinges on the stall doors in the women's restroom.  (Ex. DDB-2 at 360; TR. 1/13/06 at 80.)

The Debtor's former store director for the Premises, Mark Maloney, testified that the restrooms were in appalling condition when he worked there.  (Id. at 77-80.)  He confirmed that the toilets in the women's restroom were inoperable and in disrepair for an extended period of time.  He testified that the repairs made by DDB (totaling $8,684) were simply to get the restrooms functioning again.  (Id. at 80.)

The Court concludes that the evidence amply supports this claim.  Having inoperable public restrooms in such terrible condition did affect the Debtor's ability to operate the Premises as a grocery store.  The Court will allow an administrative claim in the amount of $8,684 for these repairs.

### 2.   Doors

#### a.   Impact Doors

DDB seeks $1,005.98 for repairs to the front impact doors of the Premises and a door leading to the produce preparation area.

10

(Ex. DDB-1 at 304-5.)  The PCT's witness, Wayne Wheeler,[3]
testified that when he inspected the Premises in March 2003, he
determined that the impact doors needed to be replaced at a cost
of $2400.  He stated, however, that the charges DDB seeks for
repair to the produce department door are not appropriate because
it is part of a fixture owned by the tenant, i.e., the cooler.
(Id. at 189.)  Maloney testified, however, that the produce doors
were not part of the cooler but were between the produce storage
area and the shopping area.  Therefore, the Court finds that the
door was not part of a fixture.  (Id. at 127.)

b.   Automatic Doors

DDB also seeks $41,720 to replace several automatic entrance
doors to the Premises.[4]  Maloney testified that when the Lease
was assigned, several of the automatic doors to the store did not
operate.  He testified that the exit doors to the liquor store
did not operate and customers had to manually push the door to
exit.  (Id. at 81.)  The main inside doors were inoperable for

---

[3]  Wheeler was the Debtor's director of store planning and
had been involved in the supermarket construction industry for 30
years.  (TR. 1/13/06 at 184.)  He testified that he inspected the
Premises in March 2003 at the request of the Debtors to determine
its condition and what repairs were necessary to put it in an
acceptable condition.  (Id. at 186.)  He also reinspected the
Premises in 2004 and prepared a report showing his analysis of
what needed to be repaired and the appropriate cost of the
recommended repairs.  (Id. at 188; Ex. PCT-13.)

[4]  The two main doors have been replaced at a cost of
$15,590 and DDB has received a quote to replace the others at a
cost of $26,130. (Ex. DDB-3 at 3, 307.)

11

over two years, requiring that they be kept open at all times, defeating the weather barrier. (Id. at 80-81, 129, 132.)  The pharmacy door did not lock, necessitating the use of straps or boards to prop it shut at night. (Id. at 83-85, 133; Ex. DDB-27 at 45733.)  Maloney testified that the Debtors never conducted regular maintenance on the doors and that they are now outdated and beyond repair. (Id. at 132-33.)

The PCT's witness, Wheeler, admitted that the doors were in disrepair and the Debtors had had servicemen working on them to no avail. (TR. 1/13/06 at 190-91.)  He determined, however, that only $1,500 was appropriate to service the main doors. (Id.; Ex. PCT-13.)  Although he acknowledged that the liquor store door needed repair, he allocated no amount for that. (Id. at 215.)

c.    Warehouse Doors

DDB seeks $2,278.80 for repairs to two large impact doors leading into the warehouse, which were missing hinges and springs and would not shut properly. (Ex. DDB-5 at 310; Ex. DDB-27B at 45669-70; TR. 1/13/06 at 87-88.)  The PCT's witness, Wheeler, agreed that the repairs were necessary for the doors to operate properly and that the amount was appropriate. (Id. at 192.)

DDB also seeks $424.63 for repair to an overhead door in the warehouse. (Ex. DDB-5 at 311.)  That door was damaged beyond repair when a truck backed into it, cracking the door and its track. (TR. 1/13/06 at 90-91; Ex. DDB-27B at 45674-75.)  The

12

PCT's witness, Wheeler, agreed that the repair was necessary.
(Id. at 192-93.)

DDB also seeks $5,599 for repairs and replacement of two
parcel pick-up doors, which lead from the check-out lanes in the
grocery store to the area outside where packages were loaded into
customers' cars.  (Ex. DDB-5 at 290; TR. 1/13/06 at 92, 94-95.)
Three of the four doors were inoperable because the hinges had
been severed and the springs were missing or cracked.  (Ex. DDB-
27A at6-7; Ex. DDB-27B at 45718, 45721; TR. 1/13/06 at 93.)

Wheeler conceded that the replacement of the hinges was a
necessary repair at a cost of $200-500.  (Id. at 193-94.)  He did
not, however, allocate any money for hinge replacement because he
felt that the damage was simply ordinary wear and tear due to the
large amount of traffic.  (Id.)

The PCT also objects to any claim for door repairs that have
not yet been completed.  It argues that the repairs are not
really necessary to the operation of a grocery store at the
Premises, because one has in fact been operating there since 2003
when the Lease was assigned.

The Court disagrees with the PCT on this point.  In order
to operate as a grocery store, the Premises need functioning
front doors.  Particularly disturbing is the fact that the
pharmacy door cannot be closed and locked at night, leaving the
pharmacy vulnerable to theft.  In addition, without the ability

13

to close the doors, the store might be subject to rodent infestation. (Id. at 83, 85.) Therefore, the Court will allow an administrative claim in the amount of $51,028.41 for all the door repairs.

### 3. Cooler Weatherstripping

DDB seeks $2,056.38 for replacement of weatherstripping of the beer coolers. (Ex. DDB-6 at 312; TR. 1/13/06 at 95-96.) Maloney testified that half the weatherstripping was missing from the coolers, preventing the sealing of the doors. (Id.)

The Court will not allow this item as an administrative claim, because it is not a critical repair. It is possible to operate the Premises as a grocery store without the weatherstripping in place, even though it reduces the efficiency of the coolers.

### 4. Ceiling Tiles

DDB seeks $47,794 for costs associated with removing and replacing ceiling tiles and grids throughout the Premises. (Ex. DDB-7.) The majority of the costs, however, were for repairs to an area over the bakery/deli section of the store and around the duct work of the HVAC system. (TR. 1/13/06 at 21, 30.) DDB's contractor testified that the tiles were yellow and covered with grease and that some were water-damaged, sagging or missing. (Id. at 21-22.) He testified that, given the condition of the tile, they could not have been cleaned or repainted. (Id. at 22,

14

38.)

The PCT's witness, Wheeler, testified that the ceiling tiles, while dirty, did not need to be replaced, but merely needed to be cleaned.  (Id. at 195, 220-21.)

The Court concludes that no administrative claim can be allowed for this item.  The Court finds that the replacement of the ceiling tiles is largely cosmetic rather than structural, and therefore it did not affect the ability of the Debtor (or the new tenant) to operate the Premises as a grocery store.

                5.    Concrete and Loading Area Repair

DDB seeks $2,857 for concrete repairs in the loading dock area.  (Id. at 23; Ex. DDB-8 at 240.)  These repairs were required because the concrete had not been maintained; as a result, the area caved in and had to be torn up and replaced. (Id.)  DDB also seeks $511.04 to replace one of four levelers in the loading area (which raises the loading dock to meet the height of the trucks).  (Id. at 103; Ex. DDB-9 at 314.)  Maloney testified that the springs were missing and it was inoperable. (Id.)

The PCT's witness, Wheeler, did not have any problem with these repairs.  (Id. at 198-99, 222.)

The Court concludes that these repairs will be allowed as an administrative claim because they were necessary for the proper operation of the Premises as a grocery store.  For proper

                                15

operation as a grocery store, there must be delivery truck access to the Premises. Therefore, the Court will allow an administrative claim in the amount of $3,368.04 for these repairs.

      6.   Cart Corral and Parking Lot Repairs

DDB also seeks $1,956.79 to replace cart corrals that had been damaged by snow plows or cars. (TR. 1/13/06 at 104; Ex. DDB-9 at 313.) Wheeler did not make any allowance for those repairs because the corrals are not attached to the building. (Id. at 198.)

DDB also seeks $1,274 to repair and seal the parking lot and loading dock area. (TR. 1/13/06 at 104-05; Ex. DDB-10 at 315-16.) The PCT's witness, Wheeler, originally did not allow for these repairs because he had not seen the areas when he inspected the Premises. (TR. 1/13/06 at 200.) After reviewing photographs of the areas, however, he conceded that the repairs were necessary. (Id.)

The Court will allow these items as administrative claims because a parking lot and functioning cart corrals are necessary for the operation of a grocery store. Therefore, the Court will allow an administrative claim in the amount of $3,230.79 for these repairs.

16

7.   Exterior Repair and Painting

DDB seeks $6,000 for tuck-pointing the exterior walls of the Premises.  (Ex. DDB-12.)  Maloney testified that this repair was necessary, because the Debtors had failed to fill cracks in the exterior wall of the store to prevent moisture from seeping into the wall.  (TR. 1/13/06 at 107-08.)  The PCT's witness, Wheeler, agreed that this repair was necessary.  (Id. at 202.)

DDB also seeks $18,000 for power-washing and painting the exterior of the building, which was peeling, worn to the cinder blocks in parts, and covered with graffiti.  (TR. 1/13/06 at 107; Ex. DDB-11.)

Finally, DDB seeks $1,476 for painting the gas pumps.  (Ex. DDB-11.)  DDB asserts that repainting was necessary, because the Debtor had allowed the gas pumps to fall into disrepair and rust. (TR. 1/13/06 at 106.)

The Court will allow these items as an administrative claim because the repairs were necessary to correct a structural problem with the building and to keep the gas pumps functioning. A claim in the amount of $25,476 will be allowed for the exterior repair and painting of the building and gas pumps.

8.   Interior Painting

DDB seeks $39,972 for painting a portion of the interior of the Premises.  (TR. 1/13/06 at 24-26; Ex. DDB-11.)  DDB asserts that, while the entire interior was repainted, it is seeking only

17

a portion of that expense for the area around the produce, deli
and bakery sections which were greasy, dirty and water-damaged.
(TR. 1/13/06 at 25-26.)   The PCT's expert testified that the
interior painting was not a necessary repair, because the walls
simply needed cleaning.   (Id. at 196, 228.)

The Court concludes that none of the interior painting was
necessary to operate the Premises as a grocery store.   Although
the interior was dirty, greasy, and in deplorable condition, it
could still function as a grocery store.   Therefore, the Court
concludes that the interior painting was merely cosmetic rather
than functional and, accordingly, will not allow any
administrative claim for interior painting.

9.   General Cleaning

DDB seeks $28,902.66 for labor costs associated with
cleaning the Premises and $12,637.50 in costs incurred in waxing
and buffing the floors.   (Ex. DDB-13.)   Several witnesses
testified that the Premises were in filthy condition.    (TR.
1/13/06 at 52, 111, 140.)   Rick Lambrecht, managing director of
the current tenant of the Premises, testified that it was
"probably one of the worst stores I've ever witnessed."   (Id. at
140.)

Notwithstanding this testimony, the Court will disallow this
item as an administrative claim because it is cosmetic only.
Despite its filthy condition, the store was able to operate.

18

10. Replacement of Floor Tile and Carpeting

DDB seeks $2,264 for replacement of carpeting in the offices of the Premises. (TR. 1/13/06 at 117; Ex. DDB-14 at 345.) DDB also seeks $154,900 for repairs to the floor tile. (Ex. DDB-14 at 112.) In many areas, the floor tile was chipped, breaking, and worn. (TR. 1/13/06 at 25-26, 180) It appeared that the floor had not been polished or sealed for quite a while, which is part of normal maintenance. (Id. at 26.) DDB asserts that it did not replace the entire floor but only necessary areas in the perimeter. (Id. at 180.)

The PCT's witness, Wheeler, estimated repair costs for the tile floor at $18,800. (Id. at 205.) However, he testified that the floor would need to be stripped to determine how much damage there was and that he did not see it after it was stripped. (Id. at 204-05, 229-30.)

The Court is not convinced that any administrative claim for this item is warranted. The floor, though chipped and worn, was still in place and, consequently, did not affect the ability of the Debtor (or new tenant) to operate the Premises as a grocery store. The Court will not award anything as an administrative claim for this repair.

11. Air Handling System Cleaning

DDB seeks $5,610 to replace two furnaces which had been designated as inoperable by the state while the Debtor was in

possession of the premises.  (TR. 1/13/06 at 120-21; Ex. DDB-15
at 291.)  The PCT's witness, Wheeler, conceded that this repair
was necessary.  (Id. at 205-06.)

DDB also seeks $359.50 for the replacement of an exhaust
pipe for the fryer.  (Ex. DDB-15 at 347.)  It asserts that the
Debtor's failure to clean the pipe regularly caused it to
corrode, thereby necessitating its repair.  (TR. 1/13/06 at 121.)
Wheeler also conceded that this repair was necessary.  (Id. at
206.)

The Court agrees that both of these repairs are necessary
for the functioning of a grocery store and, accordingly, will
allow $5,969.50 as an administrative expense for these items.

### 12.  Roof Repairs

DDB also seeks $76,230 for repairs to the roof.  (Ex. DDB-16
at 509-10.)  It asserts that this amount is not for the
replacement of the entire roof, but only for repairs needed to
stop current leaks and to prevent further deterioration of the
roof.  (TR. 1/13/06 at 143.)  DDB asserts that these repairs stem
from the Debtor's failure to maintain the roof, not from ordinary
wear and tear.  (TR. 1/13/06 at 149-50.)

The PCT's witness, Wheeler, agreed that $29,950 was
reasonable for repair to the roof.  However, he never personally
inspected the roof.  (Id. at 206-07.)  He testified that a
roofing contractor was needed to determine the damage, but the

Debtor never hired one.  (Id.)

DDB did, however, hire a roofing contractor to determine the amount of damage to the roof.  (Ex. DDB-16.)  Therefore, the Court will allow the full amount for the roof repair as an administrative claim.  Those repairs were necessary to avoid leaks in the building and, therefore, are necessary to permit the Premises to serve as a grocery store.  An administrative claim in the amount of $76,230 will be allowed for this item.

### 13.  Damage to Cafeteria Walls

DDB also seeks $11,850 for the repair of a wall in the cafeteria portion of the Premises.  (TR. 1/13/06 at 31; Ex. DDB-18 at 240.)  These repairs were necessary because black mold was growing on the walls as a result of the Debtor's failure to repair an ice machine which had been leaking for many years. (TR. 1/13/06 at 31-32, 125.)

The PCT's witness, Wheeler, conceded that he could not have seen the black mold in his inspection as it was behind the walls. (Id. at 208-09.)  He agreed that this repair was necessary.  (Id. at 226-27.)

The Court also agrees that this repair was necessary to allow the Premises to function as a grocery store.  An administrative claim in the amount of $11,850 will be allowed for this item.

21

14. Signage

DDB seeks $1,758.75 for the installation of missing vinyl signs at the gas pumps. (TR. 1/13/06 at 151; Ex. DDB-17 at 352.) These signs are required by state law and were missing when DDB took the Premises back from the Debtor.

The Court agrees that the replacement is necessary for operation of the Premises as a grocery store (with gas pumps). Consequently, the Court will allow this as an administrative claim in the amount of $1,758.75.

However, DDB also seeks $16,300 for repairs to damaged and missing signage that is merely decor. (Ex. DDB-17 at 353.) The Court will not allow any of this amount as an administrative claim because none of those repairs is necessary for the operation of a grocery store.

15. Counters

DDB seeks $24,958 to replace counters in the cake decorating area, service counter, snack counter and liquor area, all of which were in disrepair. (TR. 1/13/06 at 152-52; Ex. DDB-17 at 533.) DDB asserts that the repairs were necessary because the absence of Formica allows bacteria to grow. (TR. 1/13/06 at 153.)

Serving food requires special preparation areas that do not promote bacteria growth. Therefore, the Court will allow an administrative claim in the amount of $24,958 for this repair.

22

16.  Lighting

DDB also seeks $25,959 for replacement of lights and light
fixtures in the deli/bakery area.  (TR. 1/13/06 at 30; Ex. DDB-17
at 35354.)  DDB's contractor testified that the lights and
fixtures in that area were greasy, dirty and many were cracked or
not working.  (TR. 1/13/06 at 27-28.)  He opined that the damages
were the result of lack of maintenance and cleaning.  (Id. at
30.)

The Court will not allow any administrative claim for this
item, however, because it concludes that the replacement of dirty
and greasy lights is a cosmetic repair and not necessary to the
functioning of a grocery store.

IV.  CONCLUSION

For the reasons stated above, the Court will grant, in part,
DDB's Motion and will allow and direct payment to DDB of an
administrative expense and cure claim in the amount of
$212,553.49.

An appropriate order is attached.

Dated: August 9, 2006          BY THE COURT:

                               Mary F. Walrath
                               United States Bankruptcy Judge

23

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| FLEMING COMPANIES, INC. et al., | ) Case No. 03-10945(MFW) |
| | ) |
| Debtors | ) Jointly Administered |

### ORDER

**AND NOW** this **9th** day of **AUGUST, 2006,** upon consideration of the Motion of DDB Limited Partnership ("DDB") for allowance and payment of an administrative expense and cure claim and the objection of the Post Confirmation Trust thereto, it is hereby

**ORDERED** that the Motion is hereby **GRANTED IN PART**; and it is further

**ORDERED** that DDB shall have an allowed administrative cure claim in the amount of $212,553.49.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Brian E. Farnan, Esquire[1]

---

[1]Counsel shall serve a copy of this Opinion and Order on all interested parties, including the parties listed on the attached Service List, and file a Certificate of Service to that effect.

SERVICE LIST

Brian E. Farnan, Esquire
John C. Phillips, Jr., Esquire
Phillips, Goldman & Spence, P.A.
1200 N. Broom Street
Wilmington, DE 19806
Counsel to DDB Limited Partnership

James K. T. Hunter, Esquire
Bruce Grohsgal, Esquire
Pachulski, Stang, Ziehl, Young, Jones & Weintraub LLP
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Counsel to Post Confirmation Trust

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| FLEMING COMPANIES, INC. et al., | ) Case No. 03-10945(MFW) |
| | ) |
| Debtors | ) Jointly Administered |

**ORDER**

    **AND NOW** this **9th** day of **AUGUST, 2006,** upon consideration of the Motion of DDB Limited Partnership ("DDB") for allowance and payment of an administrative expense and cure claim and the objection of the Post Confirmation Trust thereto, it is hereby

    **ORDERED** that the Motion is hereby **GRANTED IN PART;** and it is further

    **ORDERED** that DDB shall have an allowed administrative cure claim in the amount of $212,553.49.

BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge

cc: Brian E. Farnan, Esquire[1]

_____

    [1]Counsel shall serve a copy of this Opinion and Order on all interested parties, including the parties listed on the attached Service List, and file a Certificate of Service to that effect.

SERVICE LIST

Brian E. Farnan, Esquire
John C. Phillips, Jr., Esquire
Phillips, Goldman & Spence, P.A.
1200 N. Broom Street
Wilmington, DE 19806
Counsel to DDB Limited Partnership

James K. T. Hunter, Esquire
Bruce Grohsgal, Esquire
Pachulski, Stang, Ziehl, Young, Jones & Weintraub LLP
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Counsel to Post Confirmation Trust

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| FLEMING COMPANIES, INC. et al., | ) Case No. 03-10945(MFW) |
| | ) |
| Debtors | ) Jointly Administered |

### MEMORANDUM OPINION[1]

Before the Court is the Motion of DDB Limited Partnership ("DDB") for allowance and payment of an administrative expense and cure claim in the amount of $564,414 under sections 503(b)(1)(A) and 365(b).  The Motion is opposed by the Post Confirmation Trust (the "PCT").  For the reasons set forth below, the Court will grant the Motion in part and will allow an administrative claim in the amount of $212,553.49.

I.    BACKGROUND

Fleming Companies, Inc. ("the Debtor") was a nationwide wholesale supplier of food and grocery products, as well as an operator of grocery stores.  In particular, the Debtor operated a grocery store located at 2806 Schofield Avenue, Schofield, Wisconsin (the "Premises") under a lease agreement with DDB (the "Lease") from 1994 through June 2003.  (Ex. PCT-1.)

On April 1, 2003, the Debtor and several of its affiliates filed voluntary petitions for relief under chapter 11 of the

---

[1]  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rule of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014.

Bankruptcy Code.  On May 12, 2003, the Debtor filed a motion for authority to sell certain grocery store assets and to assume and assign certain leases, including the Lease (the "Sale Motion"). In the Sale Motion, the Debtor asserted that no cure amount was due to DDB pursuant to section 365(b)(1)(A).  On May 28, 2003, DDB filed an objection to the Sale Motion, asserting a cure claim of $550,000.  DDB supplemented that objection on May 30, 2003, asserting a corrected cure claim of $750,000.  By Order dated June 4, 2003, the Court granted the Sale Motion and required that the Debtor place at least $550,000 into an interest-bearing escrow account for the DDB cure claim until the amount due could be determined.

DDB filed its cure claim on October 2, 2003, and a Motion to compel allowance and payment of the cure claim on October 6, 2003.  On September 15, 2005, the PCT filed an objection to DDB's administrative claim.  An evidentiary hearing was held on the matter on January 13, 2006.  The parties have filed post-trial briefs, and the matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (M), (N) & (O).

III. <u>DISCUSSION</u>

In its Motion, DDB asserts it is entitled to a cure claim in the amount of $564,414 pursuant to sections 503(b)(1)(A) and 365(b).  Section 503(b)(1)(A) provides that:

> [T]here shall be allowed administrative expenses . . .
> including -
>     (1)(A) the actual, necessary costs and
>     expenses of preserving the estate . . . .

11 U.S.C. § 503(b)(1)(A).  Section 365(b)(1) provides that:

> If there has been a default in an . . . unexpired
> lease of the debtor, the trustee may not assume such .
> . . lease unless, at the time of assumption of such . .
> . lease, the trustee -
>     (A) cures, or provides adequate assurance
>     that the trustee will promptly cure, such
>     default . . . .

11 U.S.C. § 365(b)(1).

The PCT does not contest DDB's entitlement to an administrative claim for the amount necessary to cure the defaults that existed at the time the Lease was assigned.  Rather, it contests the amount of that cure claim.  In its objection, the PCT asserts that many of the repairs actually performed by DDB were to improve the Premises for the benefit of the new tenant and not to cure any obligations the Debtor had to maintain or repair the Premises.  As a result, the PCT contends that no more than $111,486 is due to DDB for its administrative claim.

3

A.    <u>Sale Order</u>

In its Motion to compel, DDB initially asserts that it is entitled to be paid at least $550,000 for its cure claim, because that is the amount escrowed under the Sale Order.  The PCT responds that the Sale Order did not allow DDB's cure claim in that amount, but simply directed that the asserted amount be escrowed until the cure claim could be allowed.

The Court agrees with the PCT on this point.  The terms of the Sale Order are clear.  Exhibit A lists $0 as the undisputed amount of DDB's cure claim that was required to be paid at closing on the sale and lists $550,000 as the disputed amount of the cure claim that was required to be escrowed.[2]

B.    <u>Lease Terms</u>

DDB also argues that the Lease required the Debtor to keep the Premises in good repair, which it asserts that the Debtor failed to do.  Specifically, the Lease provides that:

> Tenant, at its cost and expense, shall be
> responsible for all repairs and maintenance [other than
> structural repairs which are the responsibility of the
> Lessor], including but not limited to keeping all the
> interior and exterior of the Demised Premises in good
> repair, including but not limited to roof, downspouts,
> gutters, sidewalks, exposed and unexposed plumbing,
> doors and door closers, floor coverings, plastered
> surfaces (other than repair and maintenance due to
> structural problems or defects), plate glass, heating,
> ventilating and air conditioning systems, except for

---

[2]  The Sale Order also required that the escrow be increased if, at the time of closing on the sale, the disputed cure claim was more than listed on Exhibit A to the Sale Order.

damage by fire and the elements and unavoidable
casualty . . . .  Tenant, at its cost and expense,
shall be responsible for striping, repairing and
resurfacing the parking area and keeping it clean, in
good repair and free of all debris; and shall keep the
landscaping in good repair.

(Ex. PCT-1 at ¶ 9(b).)  The Lease further provides:

If repairs are required to be made by Tenant pursuant
to the terms hereof, Lessor may demand that Tenant make
the same forthwith, and if Tenant refuses or neglects
to commence such repairs and complete the same with
reasonable dispatch after such demand, Lessor may make
or cause such repairs to be made . . . .  If Lessor
makes or causes such repairs to be made, Tenant agrees
that it will forthwith, on demand, pay to Lessor the
costs thereof.

(Id. at ¶ 9(e).)

Finally, the Lease details the tenant's obligations on

surrender of the premises:

Tenant shall, upon termination of this Lease,
whether by lapse of time or otherwise, surrender to
Lessor the Demised Premises, together with all
improvements, replacements and alterations thereto
(except for Tenant's trade fixtures), broom clean and
in such order, condition and repair as the Demised
Premises were in on the date the Basic Term commenced,
except for ordinary wear and tear and loss by casualty.

(Id. at ¶ 20.)

C.  Applicable Law

The PCT contends that Wisconsin law is controlling in this

case.  (Ex. PCT-1 at ¶ 25.)  The PCT argues that Wisconsin

decisional law provides that under terms similar to those in this

Lease, the tenant is obligated only to make such repairs as are

necessary to permit the premises to be used for a specific

5

purpose - in this case, a grocery store.   See, e.g., Lindsay
Bros., Inc. v. Milwaukee Cold Storage Co., 207 N.W. 2d 639 (Wis.
1973); Finnegan v. McGavock, 283 N.W. 321 (Wis. 1939).   DDB
argues that the cases cited by the PCT are distinguishable.

     In Finnegan, the landlord sued for unpaid rent and the
tenant asserted he was entitled to an abatement of rent because
the building's elevator was inoperable.   283 N.W. at 323.   The
tenant relied on a provision of the lease that permitted rent
abatement if the premises were destroyed or rendered unfit for
occupancy or use.   Id.   The Court refused to abate the rent,
however, concluding that the lease provision related only to
"sudden catastrophic events such as fires, floods, or tornadoes,
and not to slow deterioration of the structure. . ." produced by
the elements.   Id.   That case, however, did not address the issue
of whether the tenant is obligated to make repairs required of
him under the Lease during the term of his occupancy.

     In Lindsay Bros., the Court addressed the obligation of the
tenant to return the premises to the landlord at the conclusion
of the lease.   207 N.W. 2d at 641.   In that case, the city
ordered the landlord to make repairs to an elevator after the
lease had expired and the tenant had vacated the premises.   Id.
The Court determined that under the lease, the tenant was
required to surrender the premises in the same condition as at
the commencement of the lease, reasonable wear and tear excepted.

<u>Id.</u>  Consequently, the Court concluded that the lessee had "no responsibility for any repairs to the elevators in the absence of a finding that they were damaged by other than ordinary wear and tear." <u>Id.</u> at 645.  It remanded the case to the trial court to make that determination.  <u>Id.</u>

DDB argues that the <u>Lindsay Bros.</u> case is inapplicable because it did not address the lessee's obligation under the repair provision of the lease.  It argues that <u>Lindsay Bros.</u> dealt with the lessee's obligation on termination of the lease and surrender of the premises.  <u>Id.</u>  In this case, DDB contends that the Lease has not been terminated and the issue is the effect of the tenant's duty to repair the Premises during the term of the Lease (paragraph 9) rather than the tenant's obligation on termination (paragraph 20).

The <u>Lindsay Bros.</u> Court did consider, however, the tenant's obligation to keep the premises in good repair during the term of the lease and stated that:

> The lessee's obligation for repairs [during the term of the lease] is simply to prevent him from claiming a breach of the lease by the landlord during the term for the failure to make repairs that were the lessee's obligation and not the lessor's. . . .  A clause of this kind is properly construed to impose only a minimal duty on the tenant to undertake repairs.  He is obliged to keep the premises in such condition that he can use them for the purposes for which they are leased, but he is not obligated to do more.

<u>Id.</u> at 643.

7

While this is dicta, it does provide insight into how the Wisconsin Supreme Court would construe a repair provision such as the one this Court is asked to interpret in this case.  <u>See, e.g.</u>, <u>McKenna v. Ortho Pharmaceutical Corp.</u>, 622 F.2d 657 (3d Cir. 1980) ("Considered dicta by the state's highest court may also provide a federal court with reliable indicia of how the state tribunal might rule on a particular question.") Consequently, the Court concludes that the repair provision at issue must be construed "to impose only a minimal duty on the tenant to undertake repairs . . . [as are necessary] to keep the premises in such condition that [the tenant] can use them for the purposes for which they are leased."  <u>Lindsay Bros.</u>, 207 N.W. 2d at 643.

D.   <u>Required Repairs</u>

The PCT argues that under this standard, nothing is due to DDB because the Debtor was in fact operating a grocery store at the Premises at the time the Lease was assumed.  The PCT asserts that this use proves that no repairs were necessary "to keep the premises in such condition that [the tenant] can use them for the purposes for which they are leased."  <u>Id.</u>

While the Court agrees with the PCT as to the legal standard to apply, it reached a different result.  At the evidentiary hearing, DDB presented several witnesses who testified about the general condition of the Premises during the Debtor's occupancy

and at the time the Lease was assigned.  (TR. 1/13/06 at 19, 21-22, 24-25, 27, 30-31, 54-59, 62-63, 70-72, 139-40; Ex. DDB-27.)
There is no question that the Premises were in a deplorable condition at the time the Lease was assumed.  In fact, the Debtor's former manager of the store testified at length that the Debtor refused to authorize him to make needed repairs and that he quit because he was embarrassed by the condition of the store. (Id. at 70-72.)  The PCT's own witness conceded that the Premises were in a terrible condition and that at least $132,000 in repairs were required to return them to "acceptable" condition for operation of a grocery store.  (TR. at 186-87.)

The PCT argues, however, that many of the repairs for which DDB seeks reimbursement were not required under the Lease, but instead were to renovate or remodel the Premises for the convenience of the new tenant.  The Court agrees that it must review each of the categories of repairs to determine what was necessary to allow the Premises to serve as a grocery store and, therefore, what repairs the Debtor is obligated to make under the Lease and Wisconsin law.

1.  <u>Public Restrooms</u>

There was credible and extensive testimony about the need for repairs to the public restrooms in the Premises.  The contractor for DDB testified that the public restrooms were not functioning and that the water had been shut off for a period of

9

time.  (TR. 1/13/06 at 19-21.)  He testified that the partitions
were rusted and deteriorated, the toilets in the women's restroom
did not work at all, and the porcelain in the men's restroom was
cracked.  (Id.)  He testified that he charged $8,570 to repair
the restrooms.  (Id. at 20; Ex. DDB-2.)  DDB seeks an additional
$114 for the replacement of missing hinges on the stall doors in
the women's restroom.  (Ex. DDB-2 at 360; TR. 1/13/06 at 80.)

The Debtor's former store director for the Premises, Mark
Maloney, testified that the restrooms were in appalling condition
when he worked there.  (Id. at 77-80.)  He confirmed that the
toilets in the women's restroom were inoperable and in disrepair
for an extended period of time.  He testified that the repairs
made by DDB (totaling $8,684) were simply to get the restrooms
functioning again.  (Id. at 80.)

The Court concludes that the evidence amply supports this
claim.  Having inoperable public restrooms in such terrible
condition did affect the Debtor's ability to operate the Premises
as a grocery store.  The Court will allow an administrative claim
in the amount of $8,684 for these repairs.

    2.  <u>Doors</u>

        a.  <u>Impact Doors</u>

DDB seeks $1,005.98 for repairs to the front impact doors of
the Premises and a door leading to the produce preparation area.

(Ex. DDB-1 at 304-5.)  The PCT's witness, Wayne Wheeler,[3] testified that when he inspected the Premises in March 2003, he determined that the impact doors needed to be replaced at a cost of $2400.  He stated, however, that the charges DDB seeks for repair to the produce department door are not appropriate because it is part of a fixture owned by the tenant, i.e., the cooler. (Id. at 189.)  Maloney testified, however, that the produce doors were not part of the cooler but were between the produce storage area and the shopping area.  Therefore, the Court finds that the door was not part of a fixture.  (Id. at 127.)

    b.  <u>Automatic Doors</u>

DDB also seeks $41,720 to replace several automatic entrance doors to the Premises.[4]  Maloney testified that when the Lease was assigned, several of the automatic doors to the store did not operate.  He testified that the exit doors to the liquor store did not operate and customers had to manually push the door to exit.  (Id. at 81.)  The main inside doors were inoperable for

---

    [3] Wheeler was the Debtor's director of store planning and had been involved in the supermarket construction industry for 30 years.  (TR. 1/13/06 at 184.)  He testified that he inspected the Premises in March 2003 at the request of the Debtors to determine its condition and what repairs were necessary to put it in an acceptable condition.  (Id. at 186.)  He also reinspected the Premises in 2004 and prepared a report showing his analysis of what needed to be repaired and the appropriate cost of the recommended repairs.  (Id. at 188; Ex. PCT-13.)

    [4] The two main doors have been replaced at a cost of $15,590 and DDB has received a quote to replace the others at a cost of $26,130. (Ex. DDB-3 at 3, 307.)

over two years, requiring that they be kept open at all times, defeating the weather barrier. (<u>Id.</u> at 80-81, 129, 132.) The pharmacy door did not lock, necessitating the use of straps or boards to prop it shut at night. (<u>Id.</u> at 83-85, 133; Ex. DDB-27 at 45733.) Maloney testified that the Debtors never conducted regular maintenance on the doors and that they are now outdated and beyond repair. (<u>Id.</u> at 132-33.)

The PCT's witness, Wheeler, admitted that the doors were in disrepair and the Debtors had had servicemen working on them to no avail. (TR. 1/13/06 at 190-91.) He determined, however, that only $1,500 was appropriate to service the main doors. (<u>Id.</u>; Ex. PCT-13.) Although he acknowledged that the liquor store door needed repair, he allocated no amount for that. (<u>Id.</u> at 215.)

### c.   <u>Warehouse Doors</u>

DDB seeks $2,278.80 for repairs to two large impact doors leading into the warehouse, which were missing hinges and springs and would not shut properly. (Ex. DDB-5 at 310; Ex. DDB-27B at 45669-70; TR. 1/13/06 at 87-88.) The PCT's witness, Wheeler, agreed that the repairs were necessary for the doors to operate properly and that the amount was appropriate. (<u>Id.</u> at 192.)

DDB also seeks $424.63 for repair to an overhead door in the warehouse. (Ex. DDB-5 at 311.) That door was damaged beyond repair when a truck backed into it, cracking the door and its track. (TR. 1/13/06 at 90-91; Ex. DDB-27B at 45674-75.) The

PCT's witness, Wheeler, agreed that the repair was necessary. (Id. at 192-93.)

DDB also seeks $5,599 for repairs and replacement of two parcel pick-up doors, which lead from the check-out lanes in the grocery store to the area outside where packages were loaded into customers' cars. (Ex. DDB-5 at 290; TR. 1/13/06 at 92, 94-95.) Three of the four doors were inoperable because the hinges had been severed and the springs were missing or cracked. (Ex. DDB-27A at 6-7; Ex. DDB-27B at 45718, 45721; TR. 1/13/06 at 93.)

Wheeler conceded that the replacement of the hinges was a necessary repair at a cost of $200-500. (Id. at 193-94.) He did not, however, allocate any money for hinge replacement because he felt that the damage was simply ordinary wear and tear due to the large amount of traffic. (Id.)

The PCT also objects to any claim for door repairs that have not yet been completed. It argues that the repairs are not really necessary to the operation of a grocery store at the Premises, because one has in fact been operating there since 2003 when the Lease was assigned.

The Court disagrees with the PCT on this point. In order to operate as a grocery store, the Premises need functioning front doors. Particularly disturbing is the fact that the pharmacy door cannot be closed and locked at night, leaving the pharmacy vulnerable to theft. In addition, without the ability

to close the doors, the store might be subject to rodent infestation. (<u>Id.</u> at 83, 85.) Therefore, the Court will allow an administrative claim in the amount of $51,028.41 for all the door repairs.

### 3. <u>Cooler Weatherstripping</u>

DDB seeks $2,056.38 for replacement of weatherstripping of the beer coolers. (Ex. DDB-6 at 312; TR. 1/13/06 at 95-96.) Maloney testified that half the weatherstripping was missing from the coolers, preventing the sealing of the doors. (<u>Id.</u>)

The Court will not allow this item as an administrative claim, because it is not a critical repair. It is possible to operate the Premises as a grocery store without the weatherstripping in place, even though it reduces the efficiency of the coolers.

### 4. <u>Ceiling Tiles</u>

DDB seeks $47,794 for costs associated with removing and replacing ceiling tiles and grids throughout the Premises. (Ex. DDB-7.) The majority of the costs, however, were for repairs to an area over the bakery/deli section of the store and around the duct work of the HVAC system. (TR. 1/13/06 at 21, 30.) DDB's contractor testified that the tiles were yellow and covered with grease and that some were water-damaged, sagging or missing. (<u>Id.</u> at 21-22.) He testified that, given the condition of the tile, they could not have been cleaned or repainted. (<u>Id.</u> at 22,

14

38.)

The PCT's witness, Wheeler, testified that the ceiling tiles, while dirty, did not need to be replaced, but merely needed to be cleaned.  (<u>Id.</u> at 195, 220-21.)

The Court concludes that no administrative claim can be allowed for this item.  The Court finds that the replacement of the ceiling tiles is largely cosmetic rather than structural, and therefore it did not affect the ability of the Debtor (or the new tenant) to operate the Premises as a grocery store.

5.    <u>Concrete and Loading Area Repair</u>

DDB seeks $2,857 for concrete repairs in the loading dock area.  (<u>Id.</u> at 23; Ex. DDB-8 at 240.)  These repairs were required because the concrete had not been maintained; as a result, the area caved in and had to be torn up and replaced. (<u>Id.</u>)  DDB also seeks $511.04 to replace one of four levelers in the loading area (which raises the loading dock to meet the height of the trucks). (<u>Id.</u> at 103; Ex. DDB-9 at 314.)  Maloney testified that the springs were missing and it was inoperable. (<u>Id.</u>)

The PCT's witness, Wheeler, did not have any problem with these repairs.  (<u>Id.</u> at 198-99, 222.)

The Court concludes that these repairs will be allowed as an administrative claim because they were necessary for the proper operation of the Premises as a grocery store.  For proper

15

operation as a grocery store, there must be delivery truck access
to the Premises.  Therefore, the Court will allow an
administrative claim in the amount of $3,368.04 for these
repairs.

      6.  <u>Cart Corral and Parking Lot Repairs</u>

DDB also seeks $1,956.79 to replace cart corrals that had
been damaged by snow plows or cars.  (TR. 1/13/06 at 104; Ex.
DDB-9 at 313.)  Wheeler did not make any allowance for those
repairs because the corrals are not attached to the building.
(<u>Id.</u> at 198.)

DDB also seeks $1,274 to repair and seal the parking lot and
loading dock area.  (TR. 1/13/06 at 104-05; Ex. DDB-10 at 315-
16.)  The PCT's witness, Wheeler, originally did not allow for
these repairs because he had not seen the areas when he inspected
the Premises.  (TR. 1/13/06 at 200.)  After reviewing photographs
of the areas, however, he conceded that the repairs were
necessary.  (<u>Id.</u>)

The Court will allow these items as administrative claims
because a parking lot and functioning cart corrals are necessary
for the operation of a grocery store.  Therefore, the Court will
allow an administrative claim in the amount of $3,230.79 for
these repairs.

### 7.  Exterior Repair and Painting

DDB seeks $6,000 for tuck-pointing the exterior walls of the Premises.  (Ex. DDB-12.)  Maloney testified that this repair was necessary, because the Debtors had failed to fill cracks in the exterior wall of the store to prevent moisture from seeping into the wall.  (TR. 1/13/06 at 107-08.)  The PCT's witness, Wheeler, agreed that this repair was necessary.  (Id. at 202.)

DDB also seeks $18,000 for power-washing and painting the exterior of the building, which was peeling, worn to the cinder blocks in parts, and covered with graffiti.  (TR. 1/13/06 at 107; Ex. DDB-11.)

Finally, DDB seeks $1,476 for painting the gas pumps.  (Ex. DDB-11.)  DDB asserts that repainting was necessary, because the Debtor had allowed the gas pumps to fall into disrepair and rust. (TR. 1/13/06 at 106.)

The Court will allow these items as an administrative claim because the repairs were necessary to correct a structural problem with the building and to keep the gas pumps functioning. A claim in the amount of $25,476 will be allowed for the exterior repair and painting of the building and gas pumps.

### 8.  Interior Painting

DDB seeks $39,972 for painting a portion of the interior of the Premises.  (TR. 1/13/06 at 24-26; Ex. DDB-11.)  DDB asserts that, while the entire interior was repainted, it is seeking only

17

a portion of that expense for the area around the produce, deli and bakery sections which were greasy, dirty and water-damaged. (TR. 1/13/06 at 25-26.)  The PCT's expert testified that the interior painting was not a necessary repair, because the walls simply needed cleaning.  (Id. at 196, 228.)

The Court concludes that none of the interior painting was necessary to operate the Premises as a grocery store.  Although the interior was dirty, greasy, and in deplorable condition, it could still function as a grocery store.  Therefore, the Court concludes that the interior painting was merely cosmetic rather than functional and, accordingly, will not allow any administrative claim for interior painting.

     9.   <u>General Cleaning</u>

DDB seeks $28,902.66 for labor costs associated with cleaning the Premises and $12,637.50 in costs incurred in waxing and buffing the floors.  (Ex. DDB-13.)  Several witnesses testified that the Premises were in filthy condition.   (TR. 1/13/06 at 52, 111, 140.)  Rick Lambrecht, managing director of the current tenant of the Premises, testified that it was "probably one of the worst stores I've ever witnessed."  (Id. at 140.)

Notwithstanding this testimony, the Court will disallow this item as an administrative claim because it is cosmetic only. Despite its filthy condition, the store was able to operate.

### 10.  Replacement of Floor Tile and Carpeting

DDB seeks $2,264 for replacement of carpeting in the offices of the Premises.  (TR. 1/13/06 at 117; Ex. DDB-14 at 345.)  DDB also seeks $154,900 for repairs to the floor tile.  (Ex. DDB-14 at 112.)  In many areas, the floor tile was chipped, breaking, and worn.  (TR. 1/13/06 at 25-26, 180)  It appeared that the floor had not been polished or sealed for quite a while, which is part of normal maintenance.  (Id. at 26.)  DDB asserts that it did not replace the entire floor but only necessary areas in the perimeter.  (Id. at 180.)

The PCT's witness, Wheeler, estimated repair costs for the tile floor at $18,800.  (Id. at 205.)  However, he testified that the floor would need to be stripped to determine how much damage there was and that he did not see it after it was stripped.  (Id. at 204-05, 229-30.)

The Court is not convinced that any administrative claim for this item is warranted.  The floor, though chipped and worn, was still in place and, consequently, did not affect the ability of the Debtor (or new tenant) to operate the Premises as a grocery store.  The Court will not award anything as an administrative claim for this repair.

### 11.  Air Handling System Cleaning

DDB seeks $5,610 to replace two furnaces which had been designated as inoperable by the state while the Debtor was in

possession of the premises.  (TR. 1/13/06 at 120-21; Ex. DDB-15 at 291.)  The PCT's witness, Wheeler, conceded that this repair was necessary.  (Id. at 205-06.)

DDB also seeks $359.50 for the replacement of an exhaust pipe for the fryer.  (Ex. DDB-15 at 347.)  It asserts that the Debtor's failure to clean the pipe regularly caused it to corrode, thereby necessitating its repair.  (TR. 1/13/06 at 121.)  Wheeler also conceded that this repair was necessary.  (Id. at 206.)

The Court agrees that both of these repairs are necessary for the functioning of a grocery store and, accordingly, will allow $5,969.50 as an administrative expense for these items.

        12.  Roof Repairs

DDB also seeks $76,230 for repairs to the roof.  (Ex. DDB-16 at 509-10.)  It asserts that this amount is not for the replacement of the entire roof, but only for repairs needed to stop current leaks and to prevent further deterioration of the roof.  (TR. 1/13/06 at 143.)  DDB asserts that these repairs stem from the Debtor's failure to maintain the roof, not from ordinary wear and tear.  (TR. 1/13/06 at 149-50.)

The PCT's witness, Wheeler, agreed that $29,950 was reasonable for repair to the roof.  However, he never personally inspected the roof.  (Id. at 206-07.)  He testified that a roofing contractor was needed to determine the damage, but the

Debtor never hired one.  (Id.)

DDB did, however, hire a roofing contractor to determine the amount of damage to the roof.  (Ex. DDB-16.)  Therefore, the Court will allow the full amount for the roof repair as an administrative claim.  Those repairs were necessary to avoid leaks in the building and, therefore, are necessary to permit the Premises to serve as a grocery store.  An administrative claim in the amount of $76,230 will be allowed for this item.

13.  Damage to Cafeteria Walls

DDB also seeks $11,850 for the repair of a wall in the cafeteria portion of the Premises.  (TR. 1/13/06 at 31; Ex. DDB-18 at 240.)  These repairs were necessary because black mold was growing on the walls as a result of the Debtor's failure to repair an ice machine which had been leaking for many years. (TR. 1/13/06 at 31-32, 125.)

The PCT's witness, Wheeler, conceded that he could not have seen the black mold in his inspection as it was behind the walls. (Id. at 208-09.)  He agreed that this repair was necessary.  (Id. at 226-27.)

The Court also agrees that this repair was necessary to allow the Premises to function as a grocery store.  An administrative claim in the amount of $11,850 will be allowed for this item.

21

14.  Signage

DDB seeks $1,758.75 for the installation of missing vinyl signs at the gas pumps.  (TR. 1/13/06 at 151; Ex. DDB-17 at 352.) These signs are required by state law and were missing when DDB took the Premises back from the Debtor.

The Court agrees that the replacement is necessary for operation of the Premises as a grocery store (with gas pumps). Consequently, the Court will allow this as an administrative claim in the amount of $1,758.75.

However, DDB also seeks $16,300 for repairs to damaged and missing signage that is merely decor.  (Ex. DDB-17 at 353.)  The Court will not allow any of this amount as an administrative claim because none of those repairs is necessary for the operation of a grocery store.

15.  Counters

DDB seeks $24,958 to replace counters in the cake decorating area, service counter, snack counter and liquor area, all of which were in disrepair.  (TR. 1/13/06 at 152-52; Ex. DDB-17 at 533.)  DDB asserts that the repairs were necessary because the absence of Formica allows bacteria to grow.  (TR. 1/13/06 at 153.)

Serving food requires special preparation areas that do not promote bacteria growth.  Therefore, the Court will allow an administrative claim in the amount of $24,958 for this repair.

22

16.  Lighting

DDB also seeks $25,959 for replacement of lights and light fixtures in the deli/bakery area.  (TR. 1/13/06 at 30; Ex. DDB-17 at 35354.)  DDB's contractor testified that the lights and fixtures in that area were greasy, dirty and many were cracked or not working.  (TR. 1/13/06 at 27-28.)  He opined that the damages were the result of lack of maintenance and cleaning.  (Id. at 30.)

The Court will not allow any administrative claim for this item, however, because it concludes that the replacement of dirty and greasy lights is a cosmetic repair and not necessary to the functioning of a grocery store.

IV.  CONCLUSION

For the reasons stated above, the Court will grant, in part, DDB's Motion and will allow and direct payment to DDB of an administrative expense and cure claim in the amount of $212,553.49.

An appropriate order is attached.


Dated: August 9, 2006          BY THE COURT:


                               Mary F. Walrath
                               United States Bankruptcy Judge

23

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: _____  ○ BK    ○ AP

   If AP, related BK Case Number: _____

Title of Order Appealed:

_____

       Docket Number: _____    Date Entered: _____

Item Transmitted:    ○ Notice of Appeal              ○ Motion for Leave to Appeal
                ○ Amended Notice of Appeal    ○ Cross Appeal
             Docket Number: _____    Date Filed: _____

*Appellant/Cross Appellant:              *Appellee/Cross Appellee

_____    _____

Counsel for Appellant:                    Counsel for Appellee:

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?    ○ Yes    ○ No

IFP Motion Filed by Appellant?    ○ Yes    ○ No

Have Additional Appeals to the Same Order been Filed?    ○ Yes    ○ No
   If so, has District Court assigned a Civil Action Number?    ○ Yes    ○ No    Civil Action # _____

Additional  Notes:

_____

_____              By: _____
Date                                                       Deputy Clerk

_____
                                     FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _____
7/6/06